**DRURY LEGAL, LLC**
Scott R. Drury (State Bar No. 355002)
6 Carriage Lane
Highwood, Illinois 60040
Telephone: (312) 358-8225
E-Mail: scott@drurylegal.com

**ARISOHN LLC**
Joshua D. Arisohn (to be admitted *pro hac vice*)
513 Eighth Avenue, #2
Brooklyn, NY 11215
Telephone: (646) 837-7150
Email: josh@arisohnllc.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COURTNEY COLE, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LINKEDIN CORPORATION,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Courtney Cole ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all persons who have accessed video courses on LinkedIn Learning (linkedin.com/learning) (the "Website"), a website owned and operated by Defendant LinkedIn Corporation ("Defendant" or "LinkedIn").

2. Plaintiff brings this action in response to Defendant's practice of knowingly disclosing its users' personally identifiable information ("PII") and video viewing activity to Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook"), without their consent.

3. Specifically, the Website used code called the Facebook Tracking Pixel to track what videos its users watch, and to then disclose that data to Facebook along with the users' PII, including their name and email address.

4. The disclosure of that data without the consent of Plaintiff or other consumers constitutes a violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* ("VPPA").

## PARTIES

5. Plaintiff Courtney Cole is, and has been at all relevant times, a resident of New York, New York and has an intent to remain there, and is therefore a domiciliary of New York. Plaintiff created a Facebook account in approximately September 2009. Plaintiff has been a LinkedIn Premium subscriber since approximately February 2022. Through that subscription, Plaintiff has had access to the LinkedIn Learning platform and has watched several courses over the last few years. For instance, on October 11, 2023, Plaintiff watched a course on LinkedIn Learning called *Nano Tips for Negotiating Your Salary with Sho Dewan*. Unbeknownst to

Plaintiff, however, and without her consent, Defendant was sharing Plaintiff's video watching activity and her PII with Facebook. Indeed, Plaintiff's Offsite Activity Report on facebook.com (excerpted below) confirms that Defendant disclosed her data to Facebook on the same day that she watched the *Nano Tips* video:




6. Defendant LinkedIn Corporation is a Delaware corporation with its principal place of business at 1000 West Maude Avenue, Sunnyvale, CA 94085. Defendant owns and operates linkedin.com, including the LinkedIn Learning platform, which is used throughout the United States.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States.

8. This Court has personal jurisdiction over Defendant because Defendant is headquartered in this District.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

### I. The VPPA

10. The genesis of the VPPA was President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed Bork's rental history to the Washington City Paper, which then published it. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

11. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).

12. The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3).

13. A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

## II. Facebook and the Facebook Tracking Pixel

14. Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users. Facebook describes itself as a "real identity platform,"[1] meaning users are allowed only one account and must share "the name they go by in everyday life."[2] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.

15. Facebook generates revenue by selling advertising space on its website.

16. Facebook sells advertising space by highlighting its ability to target users.[3] Facebook can target users so effectively because it surveils user activity both on and off its site. This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[4] Facebook compiles this information into a

[1] *Sam Schechner and Jeff Horwitz, How Many Users Does Facebook Have? The Company Struggles to Figure It Out,* WALL. ST. J. (Oct. 21, 2021).
[2] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[3] FACEBOOK,WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.
[4] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[5]

17. Advertisers can also build "Custom Audiences."[6] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website." Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audience," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[7] Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically. One such Business Tool is the Facebook Tracking Pixel.

18. The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website. Once activated, the Facebook Tracking Pixel "tracks the people and type of actions they take."[8] When the Facebook Tracking Pixel captures an action, it sends a record to Facebook. Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

19. Advertisers control what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views

---

[5] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.
[6] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[7] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[8] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

and what buttons a visitor clicks. Advertisers can also configure the Facebook Tracking Pixel to track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases. An advertiser can also create their own tracking parameters by building a "custom event."

20. Advertisers control how the Facebook Tracking Pixel identifies visitors. The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[9] HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[10] Pixel-specific Data includes "the Pixel ID and cookie."[11]

**III. LinkedIn Learning and the Facebook Tracking Pixel**

21. LinkedIn Learning is an online learning platform with over 27 million users. It offers video courses designed to help people develop skills in business, technology, and creativity. LinkedIn Learning offers 24,300 courses from over 3,900 industry experts and thought leaders in over 20 languages.

22. To use LinkedIn Learning, LinkedIn users must subscribe to LinkedIn Premium for a cost of $39.99/month. Alternatively, businesses can purchase LinkedIn Learning subscriptions for their employees at a cost of several hundred dollars per year.

23. At relevant times, each of the Website's pages hosting video classes contained code for the Facebook Tracking Pixel which, among other things, transmitted URL data to Facebook:

---

[9] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/meta-pixel/.
[10] *Id.*
[11] *Id.*




24. The URLs disclosed to Facebook described the contents of the videos to which they linked. For instance, the video course entitled *Nano Tips for Negotiating Your Salary with Sho Dewan* had the URL https://www.linkedin.com/learning/nano-tips-for-negotiating-your-salary-with-sho-dewan/what-recruiters-won-t-tell-you-about-your-salary.

25. Accordingly, the event data Defendant disclosed to Facebook permitted an ordinary person to identify what videos an individual has watched.

26. In addition, the Website contained code for at least eight different third-party Facebook cookies:

| Name | Value | Domain |
| --- | --- | --- |
| fr | 1gFDXlkPD1SWJVUJN.AWUfhSHU4... | .facebook.com |
| locale | en_US | .facebook.com |
| ps_n | 1 | .facebook.com |
| datr | 9cvhZr5vG9HVMmQsnsSuW_aP | .facebook.com |
| wd | 1707x791 | .facebook.com |
| xs | 27%3AasgrOb2ovNSlPQ%3A2%3A... | .facebook.com |
| sb | _MvhZhEX7ZeI9FAjN0dTN-n5 | .facebook.com |
| ar_debug | 1 | .facebook.com |
| dpr | 1.5 | .facebook.com |
| c_user | 679395441 | .facebook.com |
| ps_l | 1 | .facebook.com |

27. When someone who was logged into Facebook watched a video on the Website, the Facebook Tracking Pixel transmitted PII from these Facebook cookies to Facebook along with their URL data. For instance, the c_user cookie contains a visitor's Facebook ID.

28. A Facebook ID is personally identifiable information. Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of facebook.com.

29. The combination of URL data from the Facebook Tracking Pixel and PII from the Facebook cookies embedded on the Website permitted Facebook to see who watched what video.

30. In addition, Defendant configured the Facebook Tracking Pixel on the Website to integrate with the Adobe Analytics platform, meaning that Defendant disclosed the video viewing activity, video watching data and PII of Plaintiff and other consumers with Adobe Inc. as well.

**CLASS ALLEGATIONS**

31. **Class Definition:** Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who accessed a page on LinkedIn Learning containing a video (the "Class"). Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate.

32. **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiff does not know the exact number of members of the aforementioned Class. However, given the popularity of Defendant's Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

33. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

(a) whether Defendant collected Plaintiff's and the Class's PII and video viewing activity;

(b) whether Defendant unlawfully disclosed and continues to disclose its users' PII and video viewing activity in violation of the VPPA;

(c) whether Defendant's disclosures were committed knowingly; and

(d) whether Defendant disclosed Plaintiff's and the Class's PII and video viewing activity without consent.

34. **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, used Defendant's Website to watch videos, and had her PII and video viewing activity collected and disclosed by Defendant.

35. **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA. Plaintiff and her counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiff nor her counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class. Plaintiff has raised viable statutory claims of the type reasonably expected to be raised by members of the Class, and

will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

36. **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Even if every member of the Class could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSE OF ACTION

### COUNT I
### Violation of the Video Privacy Protection Act
### 18 U.S.C. § 2710, *et seq.*

37. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

38. Defendant is a "video tape service provider" because it has created, hosted, and delivered dozens of videos on the Website throughout the United States, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded

video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

39. Plaintiff and members of the Class are "consumers" because they subscribed to Defendant's LinkedIn Premium service. 18 U.S.C. § 2710(a)(1). This makes them "subscribers" and therefore "consumers" under the VPPA.

40. Defendant disclosed to a third party, Facebook, Plaintiff's and Class members' PII. Defendant utilized the Facebook Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like her Facebook ID, along with Plaintiff's event data, including information about the videos she viewed. Defendant also used the Facebook Tracking Pixel to disclose this same data to Adobe.

41. Plaintiff and the Class members viewed videos on Defendant's Website.

42. Defendant knowingly disclosed Plaintiff's PII and video viewing activity because it knowingly installed the Facebook Tracking Pixel on the Website, and configured the Facebook Tracking Pixel to integrate with the Adobe Analytics platform.

43. Plaintiff and Class members did not provide Defendant with any form of consent, written or otherwise, to disclose their PII or video viewing activity to third parties.

44. Defendant's disclosures were not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a) Certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class

Counsel to represent the Class;

(b) Declaring that Defendant's conduct violates the statutes referenced herein;

(c) Finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) Awarding statutory damages to the extent available;

(e) Awarding prejudgment interest on all amounts awarded;

(f) Ordering injunctive relief as pleaded or as the Court may deem proper; and

(g) Awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated: February 3, 2025

**DRURY LEGAL, LLC**

By: */s/ Scott R. Drury*
Scott R. Drury

Scott R. Drury (State Bar No. 355002)
6 Carriage Lane
Highwood, Illinois 60040
Telephone: (312) 358-8225
E-Mail: scott@drurylegal.com

**ARISOHN LLC**
Joshua D. Arisohn (to be admitted *pro hac vice*)
513 Eighth Avenue, #2
Brooklyn, NY 11215
Telephone: (646) 837-7150
Email: josh@arisohnllc.com

*Attorneys for Plaintiff*