**DRURY LEGAL, LLC**
Scott R. Drury (State Bar No. 355002)
6 Carriage Lane
Highwood, Illinois 60040
Telephone: (312) 358-8225
E-Mail: scott@drurylegal.com

**ARISOHN LLC**
Joshua D. Arisohn (to be admitted *pro hac vice*)
94 Blakeslee Rd.
Litchfield, CT 06759
Telephone: (646) 837-7150
Email: josh@arisohnllc.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| COURTNEY COLE, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LINKEDIN CORPORATION,<br><br>Defendant. | Case No. 5:25-cv-01097-PCP<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT LINKEDIN CORPORATION'S MOTION TO DISMISS**<br><br>Date: July 31, 2025<br>Time: 10:00 a.m.<br>Dept.: Courtroom 8, 4th Floor<br>Judge: Hon. P. Casey Pitts |

## TABLE OF CONTENTS

**PAGE(S)**


INTRODUCTION ........................................ 1

FACTUAL BACKGROUND ........................................ 2

LEGAL STANDARD ........................................ 7

ARGUMENT ........................................ 7

I. PLAINTIFF ADEQUATELY PLEADS DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER ........................................ 7

II. PLAINTIFF ADEQUATELY PLEADS SHE IS A CONSUMER UNDER THE VPPA ........................................ 10

III. PLAINTIFF ADEQUATELY PLEADS DEFENDANT DISCLOSED HER PII ........................................ 14

- A. Defendant Disclosed Plaintiff's Facebook ID to Facebook ........................................ 14
- B. Defendant Disclosed Plaintiff's Video-Viewing Information to Facebook ........................................ 17
- C. Defendant Sent Facebook Information that Allowed It to Match Her Video-Watching Data and Her Facebook Account ........................................ 19

IV. THE "URL CALLED" FIELD DOES NOT UNDERMINE PLAINTIFF'S CLAIM ........................................ 20

V. PLAINTIFF ADEQUATELY PLEADS SCIENTER ........................................ 21

CONCLUSION ........................................ 21

## TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Ade v. Viki, Inc.*, 2024 WL 1880153 (N.D. Cal. Mar. 28, 2024) .......... 11, 15, 21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 7

*Cantu v. Tapestry, Inc.*, 697 F. Supp. 3d 989 (S.D. Cal. 2023) .......... 10

*Carroll v. Chick-fil-A, Inc.*, 2024 WL 1091193 (N.D. Cal. Feb. 13, 2024) .......... 10, 14

*Carroll v. Gen. Mills, Inc.*, 2023 WL 4361093 (C.D. Cal. June 26, 2023) .......... 8, 10

*Edwards v. MUBI, Inc.*, 2025 WL 985130 (N.D. Cal. Mar. 31, 2025) .......... 15, 18

*Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017) .......... 16, 20

*Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251 (11th Cir. 2015) .......... 11

*Fan v. NBA Props. Inc.*, 2024 WL 1297643 (N.D. Cal. Mar. 26, 2024) .......... 15, 20, 21

*Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714 (N.D. Cal. 2023) .......... 16

*Heather v. Healthline Media, Inc.*, 2023 WL 8788760 (N.D. Cal. Dec. 19, 2023) .......... 14

*Hernandez v. Chewy, Inc.*, 2023 WL 9319236 (C.D. Cal. Dec. 13, 2023) .......... 10

*In re Facebook Inc. Cons. Priv. User Profile Litig.*, 402 F. Supp. 3d 767 (N.D. Cal. 2019) .......... 8, 9

*In re Hulu Priv. Litig.*, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) .......... 16

*In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090 (N.D. Cal. 2015) .......... 21

*In re Vizio, Inc., Cons. Priv. Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) .......... 8, 11, 13

*In re Tracht Gut, LLC*,
836 F.3d 1146 (9th Cir. 2016) .......... 7

*In Re: Zynga Priv. Litig.*,
2014 WL 1814029 (9th Cir. May 8, 2014) .......... 16

*Jackson v. Fandom Inc.*,
2023 WL 4672085 (N.D. Cal. July 20, 2023) .......... 8, 9, 11, 13, 16

*Jancik v. WebMD LLC*,
2025 WL 560705 (N.D. Ga. Feb. 20, 2025) .......... 18

*Kuzenski v. Uproxx LLC*,
2023 WL 8251590 (C.D. Cal. Nov. 27, 2023) .......... 13

*Lebakken v. WebMD, LLC*,
640 F. Supp. 3d 1335 (N.D. Ga. 2022) .......... 21

*Lee v. Plex, Inc.*,
2025 WL 948118 (N.D. Cal. Mar. 28, 2025) .......... 15

*Markels v. AARP*,
689 F. Supp. 3d 722 (N.D. Cal. 2023) .......... 10, 14

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
521 F.3d 1097 (9th Cir. 2008) .......... 7

*Roney v. Miller*,
705 F. App'x 670 (9th Cir. 2017) .......... 21

*Rowe v. Educ. Credit Mgmt. Corp.*,
559 F.3d 1028 (9th Cir. 2009) .......... 7

*Sellers v. Bleacher Report, Inc.*,
2023 WL 4850180 (N.D. Cal. July 28, 2023) .......... 9, 16, 21

*Smith v. Trinity Broad. of Tex., Inc.*,
2024 WL 4394557 (C.D. Cal. Sept. 27, 2024) .......... 16

*St. Aubin v. Carbon Health Techs., Inc.*,
2024 WL 4369675 (N.D. Cal. Oct. 1, 2024) .......... 18

*Stark v. Patreon, Inc.*,
635 F. Supp. 3d 841 (N.D. Cal. 2022)........................................................................ 16

*Tawam v. Feld Ent't, Inc.*,
684 F. Supp. 3d 1056 (S.D. Cal. 2023) ..................................................................... 14

*Walsh v. Cal. Cinema Investments LLC*,
2024 WL 3593569 (C.D. Cal. July 29, 2024) ............................................................ 10

*Yoon v. Meta Platforms, Inc.*,
2024 WL 5264041 (N.D. Cal. Dec. 30, 2024) ........................................................... 18

**<u>STATUTES</u>**

Video Privacy Protection Act,
18 U.S.C. § 2710 ........................................................................................................Passim

**<u>RULES</u>**

Fed. R. Civ. P. 12(b)(6) ................................................................................................... 7

## INTRODUCTION

Plaintiff Courtney Cole ("Plaintiff") has filed a straightforward Complaint alleging that Defendant LinkedIn Corporation ("Defendant" or "LinkedIn") violated the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), by integrating third-party tracking code into the website for its online learning platform LinkedIn Learning (linkedin.com/learning) (the "Website"). Specifically, Plaintiff alleges that, in violation of the VPPA, Defendant integrated the Facebook Tracking Pixel into the Website, which resulted in Defendant disclosing personally identifiable information ("PII") and video-watching information to Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook" or "Meta") and Adobe Inc. ("Adobe").

LinkedIn has no compelling defense to Plaintiff's claim. Ignoring both Plaintiff's factual allegations and the law, Defendant argues it is not a "video tape service provider" under the VPPA. But because the Website is tailored to deliver prerecorded streaming video content to viewers, it meets the statutory definition.

Defendant also argues that Plaintiff is not a "consumer" under the VPPA. But, as alleged, Plaintiff has had a longstanding paid subscription to LinkedIn Premium that gave her access to the video content of LinkedIn Learning. Plaintiff's allegations demonstrate the necessary commitment and relationship between Plaintiff and Defendant for Plaintiff to constitute a "consumer."

Next, Defendant argues that: (a) Plaintiff does not allege that it disclosed her PII; and (b) it did not disclose the URLs of videos to Facebook. But Plaintiff expressly alleges that LinkedIn disclosed both her Facebook ID ("FID"), which is a unique identifier, and the URLs of the videos that Plaintiff viewed on LinkedIn Learning, which contained the names of the videos that she watched. Courts routinely hold allegations like Plaintiff's to be sufficient. In addition, as discussed below, Defendant's argument that it did not disclose URLs is contradicted by the record.

Defendant also argues that Plaintiff does not adequately plead scienter. But Plaintiff alleges that LinkedIn "knowingly disclosed Plaintiff's PII and video viewing activity because it knowingly installed the Facebook Tracking Pixel on the Website, and configured the Facebook Tracking Pixel to integrate with the Adobe Analytics platform." Compl. (ECF No. 1) ¶ 42. Courts routinely hold such allegations sufficient to withstand a motion to dismiss.

Unable to challenge Plaintiff's actual allegations, Defendant improperly looks beyond the four corners of the Complaint to argue that Plaintiff's claim lacks merit. Defendant goes so far as to contend that Plaintiff's counsel intentionally hid material information from the Court. But, as set out below, these arguments are highly misleading and do not hold up to scrutiny. Accordingly, the Court should deny Defendant's motion to dismiss.

## FACTUAL BACKGROUND

***LinkedIn Learning***

Defendant owns and operates the LinkedIn Learning platform (linkedin.com/learning). Compl. (ECF No. 1) ¶¶ 1, 6. "LinkedIn Learning is an online learning platform with over 27 million users." *Id.* ¶ 21. "It offers video courses designed to help people develop skills in business, technology, and creativity." *Id.* "LinkedIn Learning offers 24,300 courses from over 3,900 industry experts and thought leaders in over 20 languages." *Id.* "To use LinkedIn Learning, LinkedIn users must subscribe to LinkedIn Premium for a cost of $39.99/month." *Id.* ¶ 22; *see also id.* ¶ 5. "Alternatively, businesses can purchase LinkedIn Learning subscriptions for their employees at a cost of several hundred dollars per year." *Id.* ¶ 22.

Certain LinkedIn Learning video snippets are publicly available to users who are not subscribed to LinkedIn Premium. *See* Decl. of Raisa Cramer Decl. in Support of Def. Request for Jud. Notice ("Cramer Decl.") (ECF No. 26-2) ¶ 2. As shown below, however, those videos are merely previews of the type of content available within the paid portion of the website:




*See* Pl.'s Request for Jud. Notice ("Pl.'s RJN"), Ex. 1. The image above shows that the video is a "Preview." Moreover, as both Exhibit A to the Cramer Declaration and Exhibit 1 to Plaintiff's RJN show, LinkedIn Learning's broader content is not publicly accessible beyond a "1-month free trial." *See* Cramer Decl., Ex. A. (ECF No. 26-3) at CM/ECF 2[1]; Pl.'s RJN, Ex. 1 at CM/ECF 2.

***Defendant's Integration and Installation of Third-Party Tracking Code***

Defendant integrated and installed code for the Facebook Tracking Pixel on the Website. Compl. ¶¶ 3, 18, 23. The Facebook Tracking Pixel is "a piece of code that advertisers, like Defendant, can integrate into their website." *Id.* ¶ 18. "Once activated, the Facebook Tracking Pixel 'tracks the people and type of actions they take.'" *Id.*

When a visitor navigates to a webpage on LinkedIn Learning, including pages that host video courses, Defendant transmits two distinct pieces of information to Facebook through the Facebook Tracking Pixel. First, Defendant discloses the URL of the webpage hosting the Facebook Tracking Pixel. *Id.* ¶¶ 23-25. When the webpage hosting the Facebook Tracking Pixel contains a video, the URL contains the title of that video. *Id.* ¶ 24. "For instance, the video course entitled *Nano Tips for Negotiating Your Salary with Sho Dewan* ("Nano Tips") had the following

[1] Citations to "CM/ECF [page number]" are to the CM/ECF-stamped page numbers.

URL: https://www.linkedin.com/learning/nano-tips-for-negotiating-your-salary-with-sho-dewan/what-recruiters-won-t-tell-you-about-your-salary." *Id.*

Second, Defendant discloses the user's FID, which is embedded in the Facebook c_user cookie hosted on Defendant's website. *Id.* ¶¶ 26-28. An FID "is personally identifiable information" because "[a]nyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the [FID] to the end of facebook.com." *Id.* ¶ 28. When the URL and the FID are combined, an ordinary person is able to identify "a person as having requested or obtained specific video materials" from Defendant. *See id.* ¶ 29; 18 U.S.C. § 2710(a)(3).

Notably, "Defendant configured the Facebook Tracking Pixel on the Website to integrate with the Adobe Analytics platform, meaning that Defendant disclosed the video viewing activity, video watching data and PII of Plaintiff and other consumers with Adobe Inc. as well." *Id.* ¶ 30. As shown in the Declaration of Jessica Liu in Support of Defendant LinkedIn Corporation's Motion to Dismiss ("Liu Decl.") (ECF No. 26-4), Defendant configured the Facebook Tracking Pixel to integrate with Adobe Audience Manager, as shown below:



*See* Liu Decl. ¶¶ 8, 10.

According to the publicly-available "Adobe Audience Manager Guide" (the "Manager Guide"), Adobe Audience Manager gives "digital advertisers and publishers the tools they need to control and leverage their data assets to help drive sales success." Pl.'s RJN, Ex. 2 at CM/ECF 2. The Manager Guide details how to integrate the Adobe Audience Manager with the Facebook Tracking Pixel and contains a flow diagram showing how website data is routed from a website to its end destination. *See* Pl.'s RJN, Ex. 3 at CM/ECF 3.

Specifically, in the section of the Manager Guide titled "Facebook WCA Integration," Adobe details how to create "Facebook Website Custom Audiences (WCA) pixels for the purpose of sending web-based Audience Manager audience segments to Facebook, for online ad targeting with improved transparency." *Id.* at CMF/ECF 2. The Manager Guide contains examples of the URL traffic when a Facebook Tracking Pixel integrated with Adobe Audience Manager fires, as shown below:

> Base URL example:
> https://www.facebook.com/tr/?id=XXXXXXXXX&ev=Adobe-Audience-Manager-Segment&cd[segID]=%ALIAS%&noscript=1
>
> Example pixel fired from the page. This example shows a user who qualifies for three Audience Manager segments, with the IDs 3401321, 2993399, 3263410:
>
> https://www.facebook.com/tr/?id=6876666666662303&ev=Adobe-Audience-Manager-Segment&cd[segID]=3401321,2993399,3263410&noscript=1

*See id.* at CM/ECF 5. Importantly, those examples are almost identical to the information in the "URL called" section of the Meta Pixel Helper screenshot contained in the Liu Declaration. *Compare* Liu Decl. ¶ 10 with Pl.'s RJN, Ex. 2 at CM/ECF 5; *see also* Declaration of Jae Young Bang ("Bang Decl.) (attached hereto as Exhibit 1) ¶¶ 24-29 (corroborating Defendant's integration of Adobe Audience Manager with the Facebook Tracking Pixel).

When Adobe Audience Manager is integrated with the Facebook Tracking Pixel, as it was in this case, data flows from the website through Adobe Audience Manager to Facebook:




Pl.'s RJN, Ex. 3 at CM/ECF 3. The Manager Guide makes clear that the proper configuration of Adobe Audience Manager requires that URL information not be hidden or concealed because social media platforms, with whom that data is shared, require that the URL information "be unmasked." *See id.*

In short, when the Adobe Audience Manager is integrated with the Facebook Tracking Pixel, the URL headers of webpages visited by website users are: (a) routed from the website to Adobe and then to Facebook; and (b) visible to both Adobe and Facebook.

***"URL Called" and Adobe Audience Manager***

As shown in the Meta Pixel Helper screenshot set forth in the Liu Declaration, one of the fields within the Metal Pixel Helper is titled "URL called." *See* Liu Decl. ¶¶ 8, 10. Contrary to Defendant's description, however, the "URL called" field merely shows the URL where the Facebook Tracking Pixel sends data. Bang Decl. ¶ 19. It does not represent "the full suite of data that the Pixel collects and provides to Meta." *Id.* ¶ 22; *see also id.* ¶¶ 19-21, 23. In fact, as Dr. Bang documents in his Declaration, Defendant discloses the URLs of webpages on LinkedIn Learning to both Adobe and Meta even though those URLs are not found in the "URL called" field. Specifically, as Dr. Bang demonstrates with screenshots, Defendant sent the URL for the Nano Tips video to an Adobe server. *Id.* ¶¶ 24-29. And because Defendant integrates its Adobe

Audience Manager account with its Facebook Tracking Pixel account, the data that Defendant sends to Adobe, such as URLs, is then shared with Meta. *Id.* ¶ 29.

***Plaintiff's Subscription to LinkedIn Learning and Use of the Website***

"Plaintiff has been a LinkedIn Premium subscriber since approximately February 2022." Compl. ¶ 5. "Through that subscription, Plaintiff has had access to the LinkedIn Learning platform *and has watched several courses over the last few years*." *Id.* (emphasis added). The Complaint identifies an example of one of the "several courses" Plaintiff has watched. *See id.* Plaintiff did not consent to Defendant disclosing her video-watching behavior to third parties. *Id.*

## LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 12(b)(6), a court may dismiss a complaint if the plaintiff fails to allege facts allowing the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In considering a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the non-moving party. *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029-30 (9th Cir. 2009). The court also must "draw all reasonable inferences in favor of the plaintiff." *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016).

## ARGUMENT

### I. PLAINTIFF ADEQUATELY PLEADS DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER

Defendant contends Plaintiff has failed to sufficiently allege it is a video tape service provider under the VPPA. Mot. at 7-8. According to Defendant, "Plaintiff does not allege any facts showing that LinkedIn is 'substantially involved' in audiovisual materials, or that it has 'specifically tailored' its product 'to serve audiovisual material[s],' beyond the website being

capable of hosting videos in addition to numerous other content types." Mot. at 7 (*citing Carroll v. Gen. Mills, Inc.*, 2023 WL 4361093, at *3 (C.D. Cal. June 26, 2023)). Defendant's contention lacks merit.

The VPPA defines a "video tape service provider" as "any person, engaged in the business, . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials . . . ." 18 U.S.C. § 2710(a)(4). Courts in this district have stated that for a "defendant to be engaged in the business of delivering video content, the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to that purpose." *See In re Vizio, Inc., Cons. Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017); *see also Jackson v. Fandom Inc.*, 2023 WL 4672085, at *3 (N.D. Cal. July 20, 2023). Allegations that a defendant regularly delivers video content to its users and maintains a cache of videos and visual materials are sufficient to plead that the defendant is a video tape service provider. *See In re Facebook Inc. Cons. Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 799 (N.D. Cal. 2019). The operator of a website that hosts prerecorded streaming video content qualifies as a video tape service provider. *Jackson*, 2023 WL 4672085, at *3.

Here, Plaintiff's allegations and the reasonable inferences therefrom are sufficient to show Defendant is a video tape service provider. LinkedIn Learning—the product at issue—is not only involved in the conveyance of video content to consumers, but it is also significantly tailored to that purpose. *See* Compl. ¶¶ 5, 21, 23. As Plaintiff alleges, "LinkedIn Learning is an online learning platform with over 27 million users. It offers video courses to help people develop skills in business, technology, and creativity. LinkedIn Learning offers 24,300 courses from over 3,900 industry experts and thought leaders in over 20 languages." *Id.* ¶ 21. In other words, through LinkedIn Learning, Defendant regularly delivers video content to LinkedIn Learning users and maintains a cache of videos and video materials. *See In re Facebook*, 402 F. Supp. 3d at 799. Notably, Plaintiff viewed that video content on several occasions. Compl. ¶ 5.

Based on the above, Defendant is a video tape service provider. *See In re Facebook*, 402 F. Supp. 3d at 799; *see also Jackson*, 2023 WL 4672085, at *3; *In re Vizio*, 238 F. Supp. 3d at 1221. Defendant's argument to the contrary merely "raises factual questions about the degree to which

[Defendant's] business model is tailored to delivery of audio visual materials," making the argument premature at the motion to dismiss stage. *See Sellers v. Bleacher Report, Inc.*, 2023 WL 4850180, at *6 (N.D. Cal. July 28, 2023).

Ignoring Plaintiff's allegations and the reasonable inferences therefrom, Defendant contends "Plaintiff does not allege facts showing that LinkedIn is 'substantially involved' in audiovisual materials, or that it has 'specifically tailored' its product 'to serve audiovisual material[s],' beyond the website simply being capable of hosting videos in addition to numerous other content types." Mot. at 7. But, when properly considered, Plaintiff's allegations and the reasonable inferences therefrom are sufficient.

Notably, Defendant premises its contention on the product at issue being LinkedIn, generally, not LinkedIn Learning, as alleged by Plaintiff. As discussed above, LinkedIn Learning is specifically tailored to convey video content to consumers. But even if LinkedIn Premium, more broadly, or even LinkedIn as a whole, was the product at issue, Defendant still is a video tape service provider because it offers LinkedIn Learning and a vast array of video content to consumers. *See In re Facebook*, 402 F. Supp. 3d at 799 (finding Facebook was a video tape service provider based on allegations that it regularly delivered video content to users and maintained a cache of videos and video materials); *Jackson*, 2023 WL 4672085, at *3 (finding that the defendant was a video tape service provider because it was a website that hosted prerecorded streaming video content, and the plaintiff viewed that content).

And LinkedIn Learning is not merely ancillary to LinkedIn's overall product. It began as a separate website called lynda.com, which LinkedIn purchased for $1.5 billion. *See* Pl.'s RJN, Ex. 4; *id.*, Ex. 5 ("Lynda.com is now LinkedIn Learning"). And, as one commentator has noted, LinkedIn Learning "plays a crucial role in LinkedIn's business model" because it not only generates subscription fees, but it "also serves to strengthen user engagement on the platform." Pl. RJN, Ex. 6 at CM/ECF 7; *see also id.*, Ex. 7 at CM/ECF 4 (estimating that "Learning accounted for about 7% of LinkedIn's revenue in 2020").

Improperly looking beyond the Complaint and ignoring Plaintiff's allegations, Defendant argues that LinkedIn offers services beyond prerecorded video content, claiming Defendant

"operates a professional networking platform, not an audiovisual business." Mot. at 7. Further looking outside the Complaint, Defendant argues that: (a) "subscribers to LinkedIn Premium . . . pay for a suite of features focused on professional networking and job searching"; and (b) "[e]ven for [those] paid LinkedIn memberships, LinkedIn Learning is offered as an incidental benefit." *Id.* Defendant's bald assertions find no basis in the Complaint. In all events, the assertions do not change the fact that LinkedIn Learning provides thousands of pre-recorded videos to subscribers, and Defendant is therefore a video tape service provider.

The cases cited by Defendant (Mot. at 7-8) are distinguishable. In *Gen. Mills, Inc.*, 2023 WL 4361093, *3, the court predictably held that General Mills was not a videotape service provider because its core business is selling cereal and other foods. Likewise, in *Carroll v. Chick-fil-A, Inc.*, 2024 WL 1091193, at *1 (N.D. Cal. Feb. 13, 2024), the court held that the business of Chick-fil-A is to sell chicken, not video content. And, in *Markels v. AARP*, 689 F. Supp. 3d 722, 728 (N.D. Cal. 2023), the court held that "none of plaintiffs' allegations indicate that providing video content is a substantial or significant purpose of AARP." Here, however, Plaintiff alleges that, through LinkedIn Learning, Defendant is substantially involved in the conveyance of video content to consumers and is significantly tailored to serve that purpose. The other authorities that Defendant cites are distinguishable because, unlike here, the videos at issue were provided solely for marketing purposes, and such videos "are insufficient to bring a defendant under the definition of a VTSP." *See Walsh v. Cal. Cinema Investments LLC*, 2024 WL 3593569, at *5, 6 (C.D. Cal. July 29, 2024); *see also Hernandez v. Chewy, Inc.*, 2023 WL 9319236, at *3 (C.D. Cal. Dec. 13, 2023) (same); *Cantu v. Tapestry, Inc.*, 697 F. Supp. 3d 989, 994 (S.D. Cal. 2023) (same).

## II. PLAINTIFF ADEQUATELY PLEADS SHE IS A CONSUMER UNDER THE VPPA

Defendant contends the Court should dismiss Plaintiff's Complaint because she "does not allege she was a consumer . . . of the LinkedIn product actually providing the audiovisual content at issue." Mot. at 9. Without any basis in the Complaint, Defendant contends that "LinkedIn Premium"—to which Plaintiff had a subscription (Compl. ¶ 5)—and LinkedIn Learning served different purposes. *Id.* According to Defendant, LinkedIn Premium "focus[es] on professional networking and job searching, and only incidentally provid[es] access to LinkedIn Learning videos

as part of a suite of other offerings." *Id.* Contrary to Defendant's contention, Plaintiff adequately pleads she is a consumer.

Under the VPPA, a "consumer" is "[a]ny renter, purchaser, *or subscriber* of goods or services from a video tape service provider." 18 U.S.C. § 2710(b)(1) (emphasis added). "While being a subscriber [under the VPPA] does not require paying for goods or services . . . it does require some sort of 'ongoing commitment or relationship between the user[] and the entity.'" *Jackson*, 2024 WL 4670285, at *3 (quoting *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1257 (11th Cir. 2015)). Relatedly, even though payment is not a requisite element of a subscription, it is a factor a court may consider as part of its analysis. *In re Vizio*, 238 F. Supp. 3d at 1223. Other factors courts have considered are "registration, commitment, delivery, [expressed association,] and/or access to restricted content." *Id.* (quoting *Ellis*, 803 F.3d at 1256).

In *Jackson*, the court held that allegations that the plaintiff created an account, became a registered user, provided the defendant with her PII and then used the defendant's website to watch videos plausibly alleged the plaintiff was subscriber under the VPPA. 2024 WL 4670285, at *4. Similarly, in *Ade v. Viki, Inc.*, 2024 WL 1880153 (N.D. Cal. Mar. 28, 2024), the court held that allegations that the plaintiffs provided their names and email addresses to register as members of the defendant's website, that the membership gave the plaintiffs access to online video content and pre-recorded rentals, and that the plaintiffs watched the videos on a recurring basis plausibly alleged the plaintiffs were subscribers. *Id.* at *1. In *In re Vizio*, the court held that the plaintiffs plausibly alleged they were subscribers because they paid for the defendant's applications, and the defendant continued to service the applications via software updates. 238 F. Supp. 3d at 1223.

Here, Plaintiff is more plausibly a subscriber than the plaintiffs in *Jackson*, *Ade* and *In re Vizio*. *See id.* (noting the plaintiffs were more plausibly subscribers than in other cases). Plaintiff gained access to LinkedIn Learning in connection with her paid subscription to LinkedIn Premium—*i.e.*, LinkedIn Learning was part of the LinkedIn Premium platform. *See* Compl. ¶¶ 5, 22. A LinkedIn Premium subscription costs $39.99 per month, and Plaintiff has been a subscriber since approximately February 2022. *Id.* Plaintiff's longtime subscription to LinkedIn Premium demonstrates her commitment as a subscriber and expressed association with Defendant.

Moreover, in connection with her subscription, Plaintiff watched several LinkedIn Learning videos – *i.e.*, Defendant delivered video content to Plaintiff. *See id.* ¶ 5. Additionally, given that Plaintiff had to pay for her subscription, it is reasonable to infer that Plaintiff also: (a) registered to use LinkedIn Premium in order to access its content; and (b) provided Defendant with sensitive payment information.

Finally, based on Plaintiff's allegations, as well as Exhibit A to the Cramer Declaration and Exhibit 1 to Plaintiff's RJN, it is reasonable to infer that Plaintiff's subscription gave her access to restricted video content. *See* Compl. ¶¶ 5, 22; *see also* Cramer Decl., Ex. A (ECF No. 26-3) (showing Defendant's offer of a "1-month free trial"); Pl. RJN, Ex. 1 at CM/ECF 2. As the exhibits collectively show, Defendant offered a "preview" of the LinkedIn Learning content, as well as a one-month free trial to entice people to subscribe. Pl. RJN, Ex. 1 at CM/ECF 2; Cramer Decl., Ex. A (ECF No. 26-3) (showing Defendant's offer of a "1-month free trial"). There would be no need to offer a "preview" or free trial if all of LinkedIn Learning's video content was publicly-available.

In contending Plaintiff is not a subscriber—and, therefore, not a consumer—under the VPPA, Defendant: (a) ignores many of Plaintiff's allegations and the reasonable inferences therefrom, while improperly viewing others in the light most favorable to Defendant; and (b) improperly relies on information outside of the Complaint. *See* Mot. at 9. For instance, ignoring Plaintiff's allegations and the reasonable inferences therefrom, Defendant contends Plaintiff does not allege she is a subscriber to LinkedIn Learning. Mot. 8. Defendant bases this contention on its unsupported assertion that LinkedIn Learning and LinkedIn Premium serve different purposes. Mot. at 9.

Contrary to Defendant's contention, Plaintiff expressly alleges that by subscribing to LinkedIn Premium, she gained access to LinkedIn Learning and subsequently used LinkedIn Learning to watch videos. *See* Compl. ¶ 5. In other words, LinkedIn Learning is part of the LinkedIn Premium subscription for which Plaintiff paid. Compl. ¶¶ 5, 22.

Defendant also contends that "Plaintiff alleges nothing about being a LinkedIn Premium subscriber that necessarily implies her subscription relationship . . . is motivated by, or has any

particular connection to audiovisual materials." Mot. at 9. As a threshold matter, Defendant has concocted from whole cloth the notion that a subscriber's subscription relationship must be "motived by" audiovisual materials. Defendant cites no authority in support of its made-up proposition. Regardless, viewed in the proper light, Plaintiff's allegations show that she subscribed to LinkedIn Premium in order to watch the video content available through LinkedIn Learning. *See* Compl. ¶ 5 (through her LinkedIn Premium subscription, Plaintiff has had access to LinkedIn Learning and has watched several courses). In reaching a different conclusion, Defendant improperly views Plaintiff's allegations in the light most favorable to Defendant.

Again ignoring Plaintiff's allegations and the reasonable inferences therefrom, as well as the very materials Defendant itself submitted in connection with its motion, Defendant claims that "Plaintiff fails to allege that the one video she named, or *any* LinkedIn Learning videos she supposedly watched, were available only through her paid subscription." Mot. at 9. As discussed above, viewed in the light most favorable to Plaintiff, the record reveals that LinkedIn Learning provided access to restricted video content. Further, viewed in the light most favorable to Plaintiff, among the videos watched by Plaintiff were restricted videos. This conclusion is underscored by the fact that Defendant offered a "preview" of its restricted content in order to lure users into subscribing so that they could access the restricted content.

Importantly, even if Plaintiff only viewed publicly-available videos, that would not preclude her from being a subscriber. As discussed above, access to restricted content is only one of many factors courts consider in determining whether a person is a subscriber. *See In re Vizio*, 238 F. Supp. 3d at 1223. Indeed, nothing in *Jackson* indicates that the videos at issue were restricted to subscribers, yet the court found that the plaintiff was a subscriber. *See* 2023 WL 4670285, at *1, 4. Even the court in *Kuzenski v. Uproxx LLC*, 2023 WL 8251590 (C.D. Cal. Nov. 27, 2023), relied on by Defendant (Mot. at 10), pointed out that exclusive access to video content is just one factor to be considered in the subscriber analysis. 2023 WL 8251590, at *5, n.6. While that court noted that the videos at issue were not alleged to be exclusive to subscribers, the court made clear that it was not "creating a bright-line, categorical rule requiring that a subscription must provide access to exclusive video content not otherwise available to viewers without a

subscription." *Id.*

Defendant also argues that "Plaintiff does not allege that any video she watched was amongst" the paid LinkedIn Learning features to which she had access, an omission Defendant claims is fatal. Mot. at 9-10. Relatedly, Defendant contends that because Plaintiff watched one video that was supposedly publicly-available, no nexus exists between her subscription and LinkedIn Learning's video content. Mot. at 10. Contrary to Defendant's argument, Plaintiff alleges that through her subscription, she "has had access to the LinkedIn Learning platform and has watched several courses over the last few years." Compl. ¶ 5. Plaintiff thus sufficiently alleges a nexus.

The cases cited by Defendant are distinguishable or otherwise inapposite. For instance, in *Heather v. Healthline Media, Inc.*, 2023 WL 8788760 (N.D. Cal. Dec. 19, 2023) (Mot. at 9), the issue was whether a person who subscribes to a newsletter "comprised primarily of text and occasional hyperlinks to video content" is a subscriber under the VPPA. 2023 WL 8788760 at *2. But this case does not involve newsletters or embedded hyperlinks therein. It involves subscribing to a product that provides access to pre-recorded videos.

Defendant's reliance on *Chick-fil-A* (Mot. at 10) only serves to highlight Plaintiff's subscriber status. Unlike here, the plaintiffs in *Chick-fil-A* did not: (a) pay for a subscription; (b) register or subscribe with the defendant; (c) commit to receiving future videos; or (d) allege any nexus between their use of an app and the videos at issue. 2024 WL 1091193, at *2; *see also Tawam v. Feld Ent't, Inc.*, 684 F. Supp. 3d 1056, 1061-62 (S.D. Cal. 2023) (no nexus between videos and email mailing list). Finally, *Markels* (Mot. at 10) is inapposite as well. In that case, the court granted the plaintiffs leave to replead to allege that they "exchanged something of value, like their information, for the video content." 689 F. Supp. 3d at 728. Here, Plaintiff adequately alleges that she "exchanged something of value" because she paid LinkedIn for her subscription.

## III. PLAINTIFF ADEQUATELY PLEADS DEFENDANT DISCLOSED HER PII

### A. Defendant Disclosed Plaintiff's Facebook ID to Facebook

Defendant argues that "Plaintiff's allegations regarding disclosure of user identity are incomplete and conclusory." Mot. at 11. That is incorrect. Plaintiff alleges that Defendant

disclosed her PII to Facebook in the form of her FID, and courts in this District have found such allegations sufficient.

The VPPA prohibits a video tape service provider like Defendant from disclosing a consumer's PII. The VPPA defines PII to "include[] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). Courts have interpreted that definition to mean "information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Edwards v. MUBI, Inc.*, 2025 WL 985130, at *3 (N.D. Cal. Mar. 31, 2025) (citation and quotation marks omitted).

Here, Plaintiff expressly alleges that Defendant shared "her PII with Facebook." Compl. ¶ 5. Specifically, the Complaint states that each of the webpages on LinkedIn Learning contained a third-party Facebook cookie, called the c_user cookie, that contained Plaintiff's FID, and that "[a]nyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of facebook.com." *Id.* ¶¶ 26-28, 40. In addition, Plaintiff alleges that Facebook is a "real identify platform," meaning that "users are allowed only one account and must share 'the name they go by in everyday life.'" *Id.* ¶ 14. And, to create a Facebook account, "users must provide their first and last name, along with their birthday and gender." *Id.* In fact, a screenshot of Plaintiff's data from Facebook shows that Plaintiff's full name is connected to her account. *Id.* ¶ 5. In other words, Plaintiff's FID would readily enable an ordinary person to identify her.

Unsurprisingly, courts in this District routinely hold that an FID constitutes PII for purposes of the VPPA. *See, e.g.*, *Lee v. Plex, Inc.*, 2025 WL 948118, at *10 (N.D. Cal. Mar. 28, 2025) ("Consistent with the great weight of authority, this Court agrees that a Facebook ID is personally identifiable information for purposes of the VPPA . . . ."); *Ade*, 2024 WL 1880153, at *2 (Plaintiff plausibly alleged that a Facebook ID is PII "under the Ninth Circuit's 'ordinary person' standard" because it "uniquely identifies an individual's Facebook account . . . which generally contains a wide range of demographic and other information . . . .") (citation omitted); *Fan v. NBA Props. Inc.*, 2024 WL 1297643, at *2 (N.D. Cal. Mar. 26, 2024) (holding that the plaintiff plausibly

alleged that a Facebook ID is PII because it "allows anybody" to identify a person associated with a Facebook profile and "all personal information publicly listed on that profile.") (citation omitted); *Sellers*, 2023 WL 4850180, at *4 ("The FID is a unique identifier that is enough, on its own, to identify a person."); *Jackson*, 2023 WL 4670285, at *4 (similar); *Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 853 (N.D. Cal. 2022) (similar); *In re Hulu Priv. Litig.*, 2014 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014) ("The Facebook User ID is more than a unique, anonymous identifier. It personally identifies a Facebook user."); *In Re: Zynga Priv. Litig.*, 2014 WL 1814029, at *9 (9th Cir. May 8, 2014) (discussing how an FID is PII under 18 U.S.C. § 2702(c) of the Electronic Communications Privacy Act).

Defendant's authorities are not to the contrary. In *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017) (Mot. at 11), the information disclosed was not an FID, but merely a Roku device serial number, which the court found "*cannot* identify an individual unless it is combined with other data in [the recipient's] possession—data that [defendant] never disclosed and apparently never even possessed." *Id.* (original emphasis). Here, on the other hand, Plaintiff alleges that Defendant disclosed her FID, and an "FID is a unique identifier that is enough, on its own, to identify a person." *Sellers*, 2023 WL 4850180, at *5 (applying the reasonable person standard adopted in *Eichenberger*). Unlike a Roku serial number, an FID does not need to be combined with other data or information that is solely in the possession of Plaintiff. Rather, any person with an internet connection could identify Plaintiff with her FID by entering it at the end of the URL facebook.com in a web browser.

Likewise, in *Smith v. Trinity Broad. of Tex., Inc.*, 2024 WL 4394557 (C.D. Cal. Sept. 27, 2024), and *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 720 (N.D. Cal. 2023) (Mot. at 12), the plaintiffs' claims were dismissed with leave to amend because they failed to allege that their Facebook pages contained personal information. Here, Plaintiff alleges that her Facebook page is linked to her first name, last name, birthday and gender. Compl. ¶¶ 5, 14.

Ignoring Plaintiff's allegations and the reasonable inferences therefrom, Defendant also argues that "Plaintiff fails to allege that she was logged into Facebook at the time she was watching any video on LinkedIn." Mot. at 11. But Plaintiff expressly alleges that, when she watched videos

on LinkedIn Learning, "Defendant was sharing [her] video watching activity and her PII with Facebook." Compl. ¶ 5. Plaintiff also provides a screenshot from her Facebook account showing that Facebook received Event Data from linkedin.com on that same day and was then able to match that data to Plaintiff's account specifically. *Id.* Facebook only could have matched this data to Plaintiff's account if she was logged into her Facebook account at the time that she watched the videos on LinkedIn Learning.

Next, Defendant argues that Plaintiff does not plausibly allege that Defendant shared Plaintiff's PII because the data that she refers to "does not identify anyone." Mot. at 12. This argument makes little sense. Plaintiff alleges that her "Offsite Activity Report on facebook.com" shows data that Defendant disclosed to Facebook about her video-viewing on LinkedIn Learning. Compl. ¶ 5. The screenshot of that data confirms Plaintiff's allegations because it shows "Activity received from linkedin.com" and specifically names Plaintiff "Courtney Cole." *Id.* In other words, the screenshot shows that Facebook received Event Data from LinkedIn and was able to match that data to Plaintiff's Facebook account. Puzzlingly, Defendant contends that this screenshot merely identifies "the person who *requested* the 'Your Activity' log to be generated," and not the person necessarily associated with that data. Mot. at 12 (emphasis added). But the fact that: (a) the screenshot in paragraph 5 of the Complaint is titled "Your activity off Meta technologies"; and (b) the data was "Generated by Courtney Cole," leads to just one obvious conclusion: the "Your" referenced and Courtney Cole are one and the same. The alternative apparently espoused by Defendant—that Facebook permitted Ms. Cole to generate an Offsite Activity Report for some other user—is not plausible.

**B. Defendant Disclosed Plaintiff's Video-Viewing Information to Facebook**

Defendant argues that Plaintiff does not plausibly allege that it transmitted URLs to Facebook through its use of the Facebook Tracking Pixel. Mot. at 13. That is incorrect. As set out in the Complaint, Facebook itself describes the Facebook Tracking Pixel as code that "tracks the people and type of actions they take." Compl. ¶ 18. For instance, the Facebook Tracking Pixel "is configured to automatically collect 'HTTP Headers,'" which includes "page location." *Id.* ¶ 20. Plaintiff also specifically alleges that "each of the Website's pages hosting video classes contained

code for the Facebook Tracking Pixel which, among other things, transmitted URL data to Facebook[.]" *Id.* ¶ 23. Moreover, Plaintiff notes that "[t]he URLs disclosed to Facebook described the contents of the videos to which they linked," and provides the following example: "the video course entitled Nano Tips for Negotiating Your Salary with Sho Dewan had the URL https://www.linkedin.com/learning/nano-tips-for-negotiating-your-salary-with-sho-dewan/what-recruiters-won-t-tell-you-about-your-salary." *Id.* ¶ 24.

Importantly, Plaintiff's allegations align with the purpose of the Facebook Tracking Pixel and with how Facebook itself describes the technology. Facebook "sells advertising space by highlighting its ability to target users." *Id.* ¶ 16. "Facebook can target users so effectively because it surveils user activity both on and off its site." *Id.* The Facebook Tracking Pixel is one of the main tools that Facebook uses to conduct that surveillance. *Id.* ¶ 18. For instance, Facebook describes the Facebook Tracking Pixel as "a small snippet of code" that tracks people "when they engage with your brand, including . . . the pages of your site they visit . . . ." *See* Facebook, *Retargeting*, https://www.facebook.com/business/goals/retargeting (cited at Compl. ¶ 18 n.8); Facebook, *Meta Pixel*, https://developers.facebook.com/docs/meta-pixel/ (noting that the Facebook Tracking Pixel collects "page location" data) (cited at Compl. ¶ 20, n.9-n.11).

Plaintiff's allegations also echo how other courts have described the functionality of the Facebook Tracking Pixel. *See, e.g.*, *Edwards*, 2025 WL 985130, at *4 (accepting plaintiff's allegation that the Facebook Tracking Pixel "discloses the URL of the webpage, which contains the video title"); *Yoon v. Meta Platforms, Inc.*, 2024 WL 5264041, at *5 (N.D. Cal. Dec. 30, 2024) (same); *St. Aubin v. Carbon Health Techs., Inc.*, 2024 WL 4369675, at *5 (N.D. Cal. Oct. 1, 2024) (same); *Jancik v. WebMD LLC*, 2025 WL 560705, at *3 (N.D. Ga. Feb. 20, 2025) (citing evidence presented on class certification showing that Facebook Tracking Pixel sent the URLs of webpages with videos).

Here, the Complaint includes evidence that linkedin.com hosted the Facebook Tracking Pixel. Compl. ¶ 23. It is plausible that the Facebook Tracking Pixel on that website sent Facebook URL data because that is precisely what the Facebook Tracking Pixel is designed to do; it tracks user activity on a website so that the users can be retargeted for advertising later on based on their

interests. While the Facebook Tracking Pixel can track other things as well, tracking the pages that a user visits is its core function. To Plaintiff's knowledge, no court has ever found that it was implausible that a Facebook Tracking Pixel on a website was sending URL data.

Defendant also argues that the "URL called" field within the "Meta Pixel Helper" shows that LinkedIn Learning was not sending the URLs of the webpages hosting the Facebook Tracking Pixel. Mot. at 13-14. But, based on the actual facts, as set forth in Section IV, below, the Meta Pixel Helper shows no such thing. Rather, the screenshot of the Meta Pixel Helper submitted by Defendant in connection with its motion confirms that Defendant configured its Facebook Tracking Pixel to route URL data through Adobe on the way to its ultimate destination: Facebook. As set out below in Section IV, Plaintiff has now documented such transmissions.

### C. Defendant Sent Facebook Information that Allowed It to Match Her Video-Watching Data and Her Facebook Account

Defendant argues that "Plaintiff fails to allege sufficient facts that show her Facebook ID was transmitted to Facebook contemporaneously with any LinkedIn Learning URL, or that an ordinary person could associate these distinct data elements with one another to reveal Plaintiff's video history." Mot. at 14. But this argument ignores the well-pled allegations in the Complaint. Plaintiff expressly alleges that "the Facebook Tracking Pixel transmitted PII from these Facebook cookies to Facebook *along with* their URL data." Compl. ¶ 27 (emphasis added). In addition, "[t]he combination of URL data from the Facebook Tracking Pixel and PII from the Facebook cookies embedded on the Website permitted Facebook to see who watched what video." *Id.* ¶ 29. Plaintiff also provides a specific example. The screenshot of Plaintiff's Offsite Activity Report shows that Facebook received data from linkedin.com and then matched that data to Plaintiff's Facebook account. *Id.* ¶ 5.

Defendant also challenges Plaintiff's allegations regarding Adobe Analytics (Mot. at 15), but those arguments fail for the same reasons. Plaintiff alleges that Defendant "configured the Facebook Tracking Pixel on the Website to integrate with the Adobe Analytics platform, meaning that Defendant disclosed the video viewing activity, video watching data and PII of Plaintiff and other consumers with Adobe Inc. as well." Compl. ¶ 30. The screenshot of the Meta Pixel Helper

on linkedin.com expressly references "Adobe-Audience-Manager-Segment," corroborating Plaintiff's claim. Id. ¶ 23.

Defendant argues that in *Eichenberger*, the Ninth Circuit held that "the information the defendant allegedly disclosed to Adobe through the Adobe Analytics platform did not constitute PII under the VPPA." Mot. at 15. But, again, there, the plaintiff alleged that ESPN merely provided Adobe with a Roku device serial number. *Eichenberger*, 876 F.3d at 986. Here, on the other hand, Plaintiff alleges that Defendant provided Adobe with the same PII that it sent to Facebook: her FID—data that "allows anybody" to identify a person associated with a Facebook profile and "all personal information publicly listed on that profile." *Fan*, 2024 WL 1297643, at *2.

## IV. THE "URL CALLED" FIELD DOES NOT UNDERMINE PLAINTIFF'S CLAIM

Defendant suggests that, in the screenshot of the Meta Pixel Helper included in the Complaint at paragraph 23, Plaintiff purposefully hid the contents of the "URL called" field in some sort of attempt to mislead. Mot. at 13-14 ("It shows a data field titled 'URL called,' which Plaintiff tellingly opted not to expand, and thus to leave hidden."); *id.* at 16 ("It's likely for good reason that Plaintiff left the 'URL called' field unexpanded in the complaint."). These not-so-subtle attempts to smear Plaintiff's counsel are unfounded and untethered to the actual facts.

Defendant asserts, without any evidentiary basis, that the "URL called" field within the Meta Pixel Helper "displays, as its name indicates, any URL information transferred to Meta." Mot. at 16. For support, Defendant cites solely to the Liu Declaration at ¶¶ 8-10. *Id.* But Ms. Liu provides no basis for Defendant's description of what the "URL called" field supposedly represents. And, contrary to Defendant's statement, there is nothing in the name "URL called" that indicates that it represents "any URL information transferred to Meta."

Rather, as set out in the Bang Declaration, "[t]he 'URL called' field merely shows the URL to which the Pixel *transmits* data." Bang Decl. ¶ 19 (emphasis added). While that URL called can itself contain query data, "the kinds of data that Meta specifies that the Pixel collects . . . include more than what a URL query may carry." *Id.* ¶ 22. In other words, the URL shown in the "URL called" field "does not show the full suite of data that the Pixel collects and provides to Meta." *Id.*

Indeed, here, Dr. Bang confirms that Defendant sends the URLs of video pages on the Website to Adobe even though those URLs are not in the "URL called" field. *Id.* ¶¶ 24-29. Specifically, Dr. Bang has documented that Defendant sent the URL for the Nano Tips video to an Adobe server. *Id.* And, because Defendant integrates its Adobe Audience Manager account with its Facebook Tracking Pixel account, that data was then transmitted to Facebook. *Id.* ¶ 29.

## V. PLAINTIFF ADEQUATELY PLEADS SCIENTER

Defendant argues that "Plaintiff fails to allege facts showing that LinkedIn 'knowingly' transmitted PII." Mot. at 18. That is incorrect. Plaintiff alleges that "Defendant knowingly disclosed Plaintiff's PII and video watching behavior because it knowingly installed the Facebook Tracking Pixel on the Website, and configured the Facebook Tracking Pixel to integrate with the Adobe Analytics platform." Compl. ¶ 42. That is sufficient. *See, e.g.*, *Sellers*, 2023 WL 4850180, at *5 (where the complaint alleged that defendant "deliberately installed the Facebook pixel on its website," the "factual allegations [were] enough for the court to reasonably infer that defendant knowingly discloses personally identifying information."); *Ade*, 2024 WL 1880153, at *3 (same); *Fan*, 2024 WL 1297643, at *2 (same).

Defendant cites to *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1097 (N.D. Cal. 2015), as supposedly "instructive." Mot. at 18. But that decision is distinguishable. As Defendant acknowledges, *In re Hulu* was a decision on a summary judgment motion and, thus, has little relevance to a motion to dismiss. *See Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1343 (N.D. Ga. 2022) (distinguishing *In re Hulu* at the motion to dismiss stage where "the Court is not faced with evaluating evidence" of knowledge but rather whether the allegations in the complaint "plausibly state a claim under the VPPA upon which relief may be granted"). Here, where Plaintiff alleges that Defendant knowingly installed the Facebook Tracking Pixel on its Website, she adequately pleads scienter.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant's motion in its entirety. If the Court determines that the pleadings are deficient in any respect, Plaintiff requests leave to amend. *See Roney v. Miller*, 705 F. App'x 670, 671 (9th Cir. 2017)

(lower court erred by denying leave to amend after dismissing amended complaint).

Dated: May 20, 2025

Respectfully submitted,

**DRURY LEGAL, LLC**

By: */s/ Scott R. Drury*
Scott R. Drury

Scott R. Drury (State Bar No. 355002)
6 Carriage Lane
Highwood, Illinois 60040
Telephone: (312) 358-8225
E-Mail: scott@drurylegal.com

**ARISOHN LLC**
Joshua D. Arisohn (to be admitted *pro hac vice*)
94 Blakeslee Rd.
Litchfield, CT 06759
Telephone: (646) 837-7150
Email: josh@arisohnllc.com
*Attorneys for Plaintiff*