KEKER, VAN NEST & PETERS LLP
BENJAMIN BERKOWITZ - # 244441
bberkowitz@keker.com
MATAN SHACHAM - # 262348
mshacham@keker.com
CHRISTINA LEE - # 314339
clee@keker.com
NIALL M. FRIZZELL - # 311929
nfrizzell@keker.com
RAISA M. CRAMER - # 342390
rcramer@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

Attorneys for Defendant
LINKEDIN CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

COURTNEY COLE individually and on behalf of all other persons similarly situated,

Plaintiff,

v.

LINKEDIN CORPORATION,

Defendant.

Case No. 5:25-cv-01097-PCP

**DEFENDANT LINKEDIN CORPORATION'S REPLY IN SUPPORT OF MOTION TO DISMISS**

Date: July 31, 2025
Time: 10:00 a.m.
Dept.: Courtroom 8, 4th Floor
Judge: Hon. P. Casey Pitts

Date Filed: February 3, 2025

Trial Date: Not Yet Set

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........ 1

II. ARGUMENT ........ 2

A. Plaintiff has not alleged that LinkedIn is a "video tape services provider" *as the VPPA defines it*. ........ 2

B. Plaintiff has not alleged that she is a "consumer" *as the VPPA defines it*. ........ 4

C. Plaintiff's belated effort to supplement her defective PII allegations is unavailing. ........ 7

1. Plaintiff has not alleged disclosure of video viewing history. ........ 7

2. Plaintiff has not alleged disclosure of a user identity consistent with the legal standard. ........ 11

3. Plaintiff has not alleged that an ordinary person could connect her identity to her video viewing history. ........ 12

D. Plaintiff cannot meet, and barely addresses, the VPPA's scienter element. ........ 14

III. CONCLUSION ........ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....... 11

*Cantu v. Tapestry, Inc.*,
697 F. Supp. 3d 989 (S.D. Cal. 2023) ....... 3

*Carroll v. Chick-Fil-A, Inc.*,
2024 WL 1091193 (N.D. Cal. Feb. 13, 2024) ....... 2, 5, 6, 7

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ....... *passim*

*Ghanaat v. Numerade Labs, Inc.*,
689 F. Supp. 3d 714 (N.D. Cal. 2023) ....... 2, 3

*Hernandez v. Chewy, Inc.*,
2023 WL 9319236 (C.D. Cal. Dec. 13, 2023) ....... 2, 3

*In re Hulu Priv. Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) ....... 13, 15

*Jackson v. Fandom, Inc.*,
2023 WL 4670285 (N.D. Cal. July 20, 2023) ....... 3

*Kuzenski v. Uproxx LLC*,
2023 WL 8251590 (C.D. Cal. Nov. 27, 2023) ....... 6

*Markels v. AARP*,
689 F. Supp. 3d 722 (N.D. Cal. 2023) ....... *passim*

*MGIC Indem. Corp. v. Weisman*,
803 F.2d 500 (9th Cir. 1986) ....... 9

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016) ....... 13

*Salazar v. Paramount Global*,
133 F.4th 642 (6th Cir. 2025) ....... 5, 6, 7

*Sellers v. Bleacher Rep., Inc.*,
2023 WL 4850180 (N.D. Cal. July 28, 2023) ....... 3, 4

*Solomon v. Flipps Media, Inc.*,
136 F.4th 41 (2d Cir. 2025) ....... 9, 10, 11, 13

*St. Aubin v. Carbon Health Techs., Inc.*,
2024 WL 4369675 (N.D. Cal. Oct. 1, 2024)....................10

*Tawam v. Feld Entm't. Inc.*,
684 F. Supp. 3d 1056 (S.D. Cal. 2023)....................4, 5

*In re Vizio, Inc., Cons. Priv. Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017)....................5

*Walsh v. Cal. Cinema Invs. LLC*,
2024 WL 3593569 (C.D. Cal. July 29, 2024)....................3

**Statutes**

18 U.S.C. § 2710....................10

## I. INTRODUCTION

Plaintiff's opposition confirms that the central allegation of Plaintiff's complaint — that LinkedIn transmitted to Meta a URL identifying the video she supposedly watched — *is not true*. She does not contest that, when the figure she relied on for this allegation in her complaint is viewed in full, without the key details obscured, it *does not show* any video URL being transmitted to Meta. Seeing the writing on the wall, Plaintiff has discarded her allegation in favor of a new theory found nowhere in the complaint — that LinkedIn provided a URL to *Adobe* identifying the video she allegedly watched, and that Adobe then passed that information onto Meta. And to support this theory, she submits a *sixteen-page expert declaration*, with no explanation whatsoever for how the Court could consider its contents on a motion to dismiss. But Plaintiff's eleventh-hour theory not only appears nowhere in her complaint, it also appears nowhere in her improper expert declaration. Even Plaintiff's expert does not claim that Adobe sends video URL information to Meta.

Accordingly, Plaintiff has not alleged, and cannot allege, that LinkedIn disclosed to Meta both her identity and her video watching history, much less in such a way that a reasonable, ordinary person would understand and be able to connect the two pieces of information, as the Ninth Circuit requires for personally identifiable information ("PII"). *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017). Her failure to allege the disclosure of both components of PII to Meta is fatal to her claim, and indeed, cannot be cured on amendment, as even Plaintiff's expert witness offers no support for her new theory.

Even if that core defect were not enough, Plaintiff's opposition confirms that she also fails to state any of the other elements of a VPPA claim. Unable to stand on her allegations, Plaintiff asks the Court to review materials found nowhere in her own complaint. But Plaintiff still fails to allege that LinkedIn's business substantially involves delivery of audiovisual materials, and that LinkedIn is substantially tailored to that purpose, as required for LinkedIn to be subject to the VPPA. Plaintiff still fails to allege that her subscription to LinkedIn had anything to do with the video she alleges watching — a video that is freely accessible to the public. And Plaintiff still fails to allege — and largely fails even to argue — that LinkedIn had the requisite knowledge that

it transmitted such information. On every element, Plaintiff's cursory pleading is inadequate.

Plaintiff's gambit should be seen for what it is — an acknowledgment that the current complaint is inadequate and must be dismissed. Further, as even Plaintiff's newly articulated theory of liability fails to satisfy the basic elements of a VPPA claim — in particular failing to identify *any* transmission of PII — Plaintiff's complaint should be dismissed with prejudice.

## II. ARGUMENT

### A. Plaintiff has not alleged that LinkedIn is a "video tape services provider" *as the VPPA defines it.*

As Plaintiff herself acknowledges, and as the case law makes clear, "video tape service provider" ("VTSP") is a term of art. Under the statute, VTSP does not refer to *any* entity delivering video recordings or audiovisual materials. If it did, virtually every modern internet-based business would be a VTSP and would be exposed to VPPA liability — a proposition courts have "routinely reject[ed]." *Carroll v. Chick-Fil-A, Inc.*, 2024 WL 1091193, at *1 (N.D. Cal. Feb. 13, 2024). Rather, a VTSP is an entity "substantially involved in the conveyance of video content to consumers [and] also specifically tailored to serve that purpose." *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 718 (N.D. Cal. 2023) (quoting *Jackson v. Fandom, Inc.*, 2023 WL 4670285, at *3 (N.D. Cal. July 20, 2023)). Importantly, "substantial[]" involvement means that simply sharing video content *is not enough*. *Id.* The conveyance of video content must in fact be "a central focus of Defendant's business," *Hernandez v. Chewy, Inc.*, 2023 WL 9319236, at *3 (C.D. Cal. Dec. 13, 2023) — true to the statute's purpose as a law restricting the public dissemination of an individual's rental history from a video rental store, *Eichenberger*, 876 F.3d at 985 ("[W]e are not persuaded that the 1988 Congress intended for the VPPA to cover circumstances so different from the ones that motivated its passage."). It is not enough if videos are "ancillary to the company's purpose." *Markels v. AARP*, 689 F. Supp. 3d 722, 728 (N.D. Cal. 2023).

In her opposition, Plaintiff identifies no allegations that show that video content is *a central focus* of LinkedIn's business or that LinkedIn is *specifically tailored* to the purpose of

conveying video content.[1] She merely leans on the presence of video content on a LinkedIn webpage — LinkedIn Learning — which is not enough in and of itself. *See Markels*, 689 F. Supp. 3d at 728 (rejecting VTSP status for this reason, even where defendant, unlike LinkedIn, "creates [the] video content" hosted on the site). Plaintiff therefore fails to state a claim. *See also, e.g.*, *Walsh v. Cal. Cinema Invs. LLC*, 2024 WL 3593569, at *5 (C.D. Cal. July 29, 2024); *Cantu v. Tapestry, Inc.*, 697 F. Supp. 3d 989, 994 (S.D. Cal. 2023).

Plaintiff makes several arguments to try to salvage her claim. *First*, Plaintiff argues that the proper entity to look at under the VPPA is not LinkedIn, but rather, the "LinkedIn Learning" webpage, which hosts the video content in question. Opp. at 8-9. But Plaintiff cites no case for the proposition that one or more *pages* on a business's website should be treated as the *entity* whose purpose determines VTSP status. Moreover, Plaintiff herself alleges that she did not subscribe to LinkedIn Learning, but instead to LinkedIn's Premium service, which includes access to audiovisual material incidental to a host of other services across LinkedIn's website and app. Compl. at ¶ 5. This is the prototypical example of video content offered "ancillary to the company's purpose." *Markels*, 689 F. Supp. 3d at 728.

*Second*, Plaintiff contends that the case law against her is "distinguishable," Opp. at 10, but the only distinctions she draws are based on background facts immaterial to the rule of decision in these cases — that Plaintiff must identify delivery of audiovisual material as a central purpose of LinkedIn's business. Plaintiff fails to do so. *See also* Mot. at 6-8. The case law on this point is consistent, even if the specific online businesses to which the principle is applied may vary. *See, e.g.*, *Ghanaat*, 689 F. Supp. 3d at 718; *Jackson*, 2023 WL 4670285, at *3; *Hernandez*, 2023 WL 9319236, at *3.

Indeed, in *Sellers*, one of the cases that Plaintiff relies on, the court denied a motion to dismiss on the VTSP element where the defendant's website was devoted to sharing sports highlights, sports recaps, and sports news — video content integrated across the business, and

[1] Indeed, Plaintiff complains that any discussion of LinkedIn's purpose is beyond the allegations in her complaint. Opp. at 9:27-10:7. But in so doing Plaintiff is not making an argument against LinkedIn's motion to dismiss, but against her own pleading. It is her obligation to allege facts sufficient to establish that delivery of audiovisual materials is "a central focus of Defendant's business." *Hernandez*, 2023 WL 9319236, at *3.

sometimes accompanied by written content. *Sellers v. Bleacher Rep., Inc.*, 2023 WL 4850180, at *1 (N.D. Cal. July 28, 2023). The court deemed that situation a "close[] call." *Id.* at *6. Not so here, where there is no allegation that LinkedIn's business consists of distributing audiovisual material in the same way — and where Plaintiff's complaint does not even focus on the central purpose of LinkedIn's business, but instead on the purpose of the "LinkedIn Learning" page on LinkedIn's website. Opp. at 8-9.

*Finally*, as a backstop, Plaintiff attempts to bring in new facts, through a request for judicial notice ("RJN"), to suggest that video content is in fact a focus of LinkedIn's business. Opp. at 9. But Plaintiff's resort to an RJN to bolster her pleading is effectively an admission that the pleading fails in its current form. Plaintiff cannot defeat a motion to dismiss by proffering allegations *she has not made*. Plaintiff's complaint should accordingly be dismissed for failure to allege that LinkedIn is a VTSP.

### B. Plaintiff has not alleged that she is a "consumer" *as the VPPA defines it.*

Plaintiff's opposition also confirms that she has not and cannot plead facts sufficient to establish the "factual nexus or relationship between the subscription provided by the defendant and the defendant's allegedly actionable video content," as necessary to qualify her as a "consumer" under the VPPA, for two reasons. *Tawam v. Feld Entm't. Inc.*, 684 F. Supp. 3d 1056, 1061 (S.D. Cal. 2023).

*First*, Plaintiff is *not* a subscriber of LinkedIn Learning (the portion of LinkedIn's website she now claims is the proper entity for purposes of the VTSP element). Compl. at ¶ 5. This alone deprives her of the requisite factual nexus. *See Tawam*, 684 F. Supp. 3d at 1061; *see also Markels*, 689 F. Supp. 3d at 728. Plaintiff now contends in her opposition that "she subscribed to LinkedIn Premium *in order to* watch the video content available through LinkedIn Learning." Opp. at 13 (citing Compl. at ¶ 5) (emphasis added). But the cited portion of Plaintiff's complaint simply does not say that. *See* Compl. at ¶ 5. Plaintiff's complaint shows that Plaintiff happened to obtain access to LinkedIn Learning by virtue of having subscribed to LinkedIn Premium, *see id.*, a service Plaintiff acknowledges to be distinct and subject to its own subscriptions, *id.* at ¶ 22. Nowhere does Plaintiff allege that she subscribed to LinkedIn Premium *in order to* watch video

content, because of video content, or in connection with LinkedIn-hosted video content in any way. *See Tawan*, 684 F. Supp. 3d at 1061; *see also, e.g.*, *Salazar v. Paramount Global*, 133 F.4th 642, 650-51 (6th Cir. 2025) ("[A] person is a 'consumer' only when [s]he subscribes to 'goods or services' *in the nature of 'video cassette tapes or similar audio visual materials.'*" (emphasis added)).

Plaintiff also suggests that she should be deemed a subscriber of LinkedIn Learning despite not subscribing to it, as she demonstrated a "commitment" to or "association" with it. Opp. at 11-12 (citing, repeatedly, Compl. at ¶ 5).[2] But again, that is precisely what Plaintiff *has not done* in paragraph 5 of her complaint — or anywhere else in her threadbare allegations. Plaintiff simply alleges that she subscribed to LinkedIn Premium, thereby happened to obtain access to LinkedIn Learning, and "has watched several courses over the last few years." Compl. at ¶ 5.

*Second*, Plaintiff has not alleged viewing any content accessible specifically through her subscription. *See* Mot. at 6, 10. There is therefore no connection between "the subscription . . . and the . . . allegedly actionable video content." *Tawam*, 684 F. Supp. 3d at 1061. The only video Plaintiff has identified in her complaint is not subscriber-restricted content. The video link, which is incorporated by reference in Plaintiff's complaint, is freely viewable, in full, by any member of the public — even without a LinkedIn account. *Id.*

This defect is fatal to Plaintiff complaint. *Tawam*, 684 F. Supp. 3d at 1061. Courts in this circuit have addressed this issue before — for example, in *Carroll*, where the plaintiffs failed to allege that they used the defendant's application "to access any videos that were not freely available on [the defendant's] websites." *Carroll*, 2024 WL 1091193, at *2. There was thus no

[2] Plaintiff cites *In re Vizio* for the proposition that these abstractions are appropriate touchstones for identifying a "subscriber" and thus a "consumer" under the VPPA. Opp. at 11 (citing *In re Vizio, Inc., Cons. Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017)). In fact, the court in *In re Vizio* was simply discussing how courts outside the Ninth Circuit had addressed whether those downloading free mobile apps are "subscribers" of the app. *In re Vizio*, 238 F. Supp. 3d at 1223. The court ultimately concluded that the plaintiffs in *In re Vizio* were plausible VPPA consumers because they alleged "*pay[ing]. . . a premium* for Smart TVs *because of their ability to seamlessly deliver video content* to consumers through Vizio's [various video streaming services]." *Id.* (emphases added). As noted, that type of allegation — a commercial relationship premised on access to restricted audiovisual material — appears nowhere in Plaintiff's complaint. Thus, Plaintiff's complaint fails even under the looser view of the case law that Plaintiff prefers.

"nexus between the app and the videos" — no plausible allegation "that they exchanged anything with [the defendant]" specifically "in relation to the video content" at issue. *Id.* There was accordingly no VPPA claim. *Id.* So too here.[3] *See also, e.g.*, *Salazar*, 133 F.4th at 652-53 (affirming dismissal because, "[i]f anything, the complaint suggested that the relevant videos were accessible to anyone, even those without a . . . subscription, by going directly on [the website]").

Plaintiff argues in response, based on a static screenshot of the video she has provided on which the word "Preview" appears, that the Court must conclude, as a matter of judicial notice, that the video is not publicly accessible. Opp. at 11-12. But for every single short video in the "Nano Tips" series, including the one that Plaintiff alleges watching, the supposed "Preview" is *the entire video*. *See* Mot. at 6 n.2 (explaining in detail how to navigate through the contents of the "Nano Tips" videos, viewing each short video in full); Dkt. 26-2 (Cramer Decl.) ¶ 3.[4] Anyone can confirm as much by simply accessing the video link provided and incorporated by reference in Plaintiff's complaint. Compl. at ¶¶ 5, 24.

Plaintiff also vaguely insists that "she 'exchanged something of value' because she paid LinkedIn for her subscription." Opp. at 14. But exchanged something of value *for what*? Certainly not for video content, given that the only video she identifies is free to the public. *Markels*, 689 F. Supp. 3d at 728 (granting a motion to dismiss because plaintiffs did not allege that "they exchanged something of value . . . *for the video content*" (emphasis added)); *Kuzenski v. Uproxx LLC*, 2023 WL 8251590, at *5 (C.D. Cal. Nov. 27, 2023) (no nexus between the subscriber and the audiovisual material if "any user can access the video [at issue] on the Website"). Plaintiff tellingly omits the other half of the transaction, because Plaintiff simply

[3] Again, Plaintiff has no answer on the case law, and so Plaintiff resorts to distinguishing cases on the basis of immaterial background facts. *See* Opp. at 14; *supra* section II.A.

[4] For example, after visiting the webpage in Plaintiff's complaint (http://www.linkedin.com/learning/nano-tips-for-negotiating-your-salary-with-sho-dewan), any member of the public can see the contents of the "Nano Tips" videos by scrolling through the "Content" column on the right-hand side of the page. The first header, "Navigating Your Salary Negotiation," consists of eight videos. All are publicly viewable in full. The second header, "Scripts You Can Use When Negotiating Your Salary," consists of two videos. Both are publicly viewable in full. *None* of the "Nano Tips" content is restricted, as anyone can see from visiting the page. Transcripts of the videos are also fully accessible to the public at the bottom of the page.

never engaged in the type of transaction that would render her a VPPA "consumer." As a last-ditch effort, Plaintiff suggests that the Court should simply look past these gaps in her pleading because she is the nonmoving party. Opp. at 13-14. But it is not the Court's job to complete Plaintiff's pleading for her. Failure to plead the requisite nexus requires dismissal. *See, e.g.*, *Salazar*, 133 F.4th at 652-53; *Markels*, 689 F. Supp. 3d at 728; *Carroll*, 2024 WL 1091193, at *2.

### C. Plaintiff's belated effort to supplement her defective PII allegations is unavailing.

#### 1. Plaintiff has not alleged disclosure of video viewing history.

Having built her complaint around evidence that — once fully revealed — disproves her own claim, Plaintiff now asks this Court to consider an entirely different theory supported by an expert declaration that arrives too late, with too little.

In her pleadings, Plaintiff claimed that LinkedIn transmitted video titles to Meta by virtue of the Meta Pixel's sharing of page URLs that incorporated those titles. *See* Compl. at ¶ 23. She grounded this claim in a screenshot of the Meta Pixel Helper. *See id.* In its motion, LinkedIn explained that those allegations were insufficient because they failed to demonstrate transmission of any video viewing history. Mot. at 13-14. Moreover, the information incorporated by reference into Plaintiff's complaint revealed that her screenshot of the Meta Pixel Helper left hidden the "URL called" field, which, when expanded, disproved her claim. *See* Liu Decl. (Dkt. 26-4) at ¶¶ 8-10.

Plaintiff does not now dispute LinkedIn's position that she cannot show video title information was transmitted by LinkedIn to Meta when the Pixel fired — a concession she effectively makes in response. She does not contest that LinkedIn's expanded Meta Pixel Helper screenshot is properly incorporated by reference, nor does she dispute its accuracy. Indeed, she specifically confirms it. Bang Decl. (Dkt. 33-1) at ¶ 20.[5]

[5] Plaintiff attempts to deflect from her allegations by arguing that the Meta Pixel Helper doesn't show the entirety of the information transmitted to Meta. Opp. at 20. But Plaintiff herself invoked the Meta Pixel Helper as her evidentiary foundation that Meta received video titles. Compl. at ¶ 23. And whatever its limitations, the URL Called field *does* capture and display data actually transmitted — including, critically, URLs shared with Meta. *See* Opp. at 20 (the "URL called can itself contain query data" including "'the kinds of data that Meta specifies that the Pixel collects'").

Left with no way to contest that the key allegation in her complaint was inaccurate, Plaintiff pivots, abandoning her original theory for an entirely new one. She now argues that "when the Adobe Audience Manager is integrated with the Facebook Tracking Pixel, the URL headers of webpages visited by website users are: (a) routed from the website to Adobe and then to Facebook; and (b) visible to both Adobe and Facebook." Opp. at 6. In other words, Plaintiff argues that the video URL is sent by LinkedIn to Adobe and then by Adobe to Meta. This theory does not save her claim and in fact shows why it must be dismissed with prejudice.

*First*, the new theory does not appear anywhere in her complaint. The complaint's treatment of Adobe spans precisely three paragraphs, none containing factual allegations of PII transfer to Adobe:

> 30. In addition, Defendant configured the Facebook Tracking Pixel on the Website to integrate with the Adobe Analytics platform, meaning that Defendant disclosed the video viewing activity, video watching data and PII of Plaintiff and other consumers with Adobe Inc. as well.
>
> . . .
>
> 40. Defendant disclosed to a third party, Facebook, Plaintiff's and Class members' PII. Defendant utilized the Facebook Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like her Facebook ID, along with Plaintiff's event data, including information about the videos she viewed. Defendant also used the Facebook Tracking Pixel to disclose this same data to Adobe.
>
> . . .
>
> 42. Defendant knowingly disclosed Plaintiff's PII and video viewing activity because it knowingly installed the Facebook Tracking Pixel on the Website, and configured the Facebook Tracking Pixel to integrate with the Adobe Analytics platform.

Compl. at ¶¶ 30, 40, 42.

In sum, Plaintiff merely alleges that LinkedIn "configured" a pixel to "integrate" with Adobe — words that convey nothing about transmission of a URL containing video title information. *Id*. at ¶¶ 30, 40, 42. And these allegations say nothing about the unpled theory

Plaintiff now posits.[6] Because her new theory is not in her complaint, Plaintiff takes the extraordinary step of submitting it in a lengthy expert declaration. But Plaintiff has provided the Court with no basis whatsoever — not even an attempt at a request for judicial notice — to consider her purported expert declaration in evaluating the motion to dismiss. *See Weisman*, 803 F.2d at 504. The mere fact that Plaintiff offers an expert declaration in an attempt to support her new theory is alone grounds for dismissal. *See MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (courts are limited to the pleadings and matters judicially noticeable on a motion to dismiss).

*Second*, even if the Court were to consider Plaintiff's declaration, it does not support her new theory. While Dr. Bang spends many paragraphs trying to establish that URL information is sent from LinkedIn to Adobe, nowhere in his declaration does he ever claim that Adobe transfers any URL at all to Meta, much less a URL *containing a video title* (in any form). Indeed, Dr. Bang's own testing at most reveals that when users visit LinkedIn's "Nano Tips" page, Meta receives only generic Adobe-Audience-Manager-Segment identifiers, with no reference to the video title or page URL. Bang Decl. at ¶¶ 20-30. And while Dr. Bang opines that Adobe receives an encoded video page URL, critically, he stops well short of ever saying that Adobe forwards this data to Meta. *Id.* at ¶ 29. Because even Plaintiff's own expert never says what she offers through attorney argument now, even if she were allowed to replead to incorporate the purported findings in Dr. Bang's declaration, she would still fail to allege that LinkedIn ever

[6] Plaintiff's attempts to re-spin her allegations regarding Meta also demonstrate the futility of her endeavor. Unable to rely on her initial (incorrect) allegations that LinkedIn discloses URLs containing video title information to Meta, she now resorts to sheer speculation that the video titles are somehow transmitted via the Pixel's ability to capture "PageView" actions. Opp. at 18. Yet rather than pointing to any factual allegations, she relies on what she claims is the general "purpose" of the Pixel and characterizes her allegations as "echo[ing] how other courts have described the functionality of the Facebook Tracking Pixel." *Id.* at 18. Not only is this assertion unpled, but it is also implausible. As the Second Circuit has explained, "'PageView' is an *optional feature* that allows the Pixel to capture the URL and title of each video that a user accesses on a provider's website." *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 45 (2d Cir. 2025) (emphasis added) (noting also that "[d]uring the installation process, [defendant] *configured* the Pixel on its website to include PageView"). Here, Plaintiff has identified no facts, either in her complaint or even in Dr. Bang's declaration, showing that LinkedIn configured the Meta Pixel to enable the PageView feature.

conveyed any video viewing history to Meta.[7]

Moreover, even if the URL data that Dr. Bang claims was transmitted from LinkedIn to Adobe had actually then been transmitted from Adobe to Meta, that data would not constitute video information under the law, because it is not information from which an ordinary person would be able to identify a video watched.[8] What Dr. Bang claims was transmitted from LinkedIn to Adobe was URL information interspersed and buried deeply within dense technical strings. *See* Bang Decl. at ¶ 28. Here, the Second Circuit's recent decision in *Solomon v. Flipps Media* is instructive. Applying the ordinary person standard, the court held it was implausible that an ordinary person could discern PII from information transmitted as "some twenty-nine lines of computer code." *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 54 (2d Cir. 2025). The VPPA requires that disclosed information "*readily* permit an ordinary person to identify" a video title. *Eichenberger*, 876 F.3d at 985 (quoting *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 267 (3d Cir. 2016)). Plaintiff offers no explanation for how an ordinary person would be able to discern video titles from these encoded strings — precisely the type of technical gibberish the *Solomon* court held is incomprehensible to laypeople.

All told, Plaintiff has nothing to offer for her eleventh-hour theory that Adobe transmits LinkedIn Learning video viewing history to Meta: her allegations do not in any way state her new theory; her improper expert declaration offers no support for her claim; and all that Plaintiff offers consists of naked attorney argument. Neither Plaintiff's old nor new theories of video title transmission pass muster under Ninth Circuit law. Plaintiff's gambit simply makes clear that her VPPA claim should be dismissed with prejudice.

---

[7] Plaintiff's own cited cases illuminate her pleading failure. In those cases, the complaints demonstrated transmission of a video's page URL, in stark contrast to Plaintiff's allegations. *See, e.g.*, *St. Aubin v. Carbon Health Techs., Inc.*, 2024 WL 4369675, at *4 n.4 (N.D. Cal. Oct. 1, 2024) (finding "complaint contains examples of actual searches, including screenshots" demonstrating transmission of "descriptive URLs"); *see also Solomon*, 136 F.4th at 46 (discussing an "'exemplar screenshot' depicting the transmission").

[8] Moreover, even if Plaintiff's theory had some support, the VPPA "looks to what information a video service provider discloses, not to what the recipient of that information decides to do with it." *Eichenberger*, 876 F.3d at 985; *see also* 18 U.S.C. § 2710(b)(1).

**2. Plaintiff has not alleged disclosure of a user identity consistent with the legal standard.**

Plaintiff's allegation about transmission of user identity is equally deficient. In her opposition, Plaintiff doubles down on her conclusory allegation that she "expressly alleges that Defendant shared 'her PII with Facebook.'" Opp. at 15 (quoting Compl. at ¶ 5). But her response only underscores the point — alleging that LinkedIn shared PII with Facebook is merely restating a statutory element of a VPPA claim, not a *factual* allegation that plausibly shows that LinkedIn transmitted her identity to Meta. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). !None of Plaintiff's attempts to dress up her conclusory allegations of user identity transmission bring them into the realm of plausibility.

*First*, Plaintiff's assertion that LinkedIn's webpage "contained a third-party Facebook cookie" with her Facebook ID is implausible and unsupported by any well-pled facts. Opp. at 15. As the Second Circuit has explained, "[b]ecause these c_user cookies are created and placed *by Facebook* on the Facebook users' *browsers*, *only Facebook's servers can access them*." *Solomon,* 136 F.4th at 45 (emphases added). Plaintiff offers no facts explaining how *LinkedIn* could access, possess, or transmit Facebook's proprietary cookies, or how such cookies could be on a LinkedIn *webpage* (as opposed to a user's *browser*). Indeed, not even Plaintiff's improper expert declaration shows that LinkedIn ever possesses a user's Facebook ID, let alone that LinkedIn transmits Facebook IDs to Meta and Adobe. Instead, the declaration confirms that Meta uses its own "c_user" cookie for authentication but stops short of stating that LinkedIn has access to or transmits this Facebook-specific information to any entity, much less Adobe. Bang Decl. at ¶ 22; *see also id.* at ¶¶ 20-30.

But even if Plaintiff could somehow establish the transmission of a c_user cookie, Plaintiff still never alleges facts plausibly showing that the c_user cookie is transmitted in a manner that would allow an ordinary person to identify a specific person. Whether the information appears in a readable format, as a string of numbers, or as part of a larger data transmission is essential to pleading her claim. *See Solomon*, 136 F.4th at 54 (noting that "the FID would be just one phrase embedded in many other lines of code" and "what an individual

would see is, for example, a phrase such as 'c_user=123456' or 'c_user=00000000'"). Her complaint is bereft of any allegations showing that an ordinary person would know what to do with, and would be able to identify anyone with, such a string of numbers.

*Second*, Plaintiff effectively concedes that she never alleges that her own personal information appeared publicly on her Facebook profile. Nor does she dispute that her privacy settings must allow for an ordinary person to identify her. In response, she asks this Court simply to *infer* that her personal information did appear publicly on her Facebook profile, based solely on her bare assertion that "to create a Facebook account, 'users must provide their first and last name, along with their birthday and gender.'" Opp. at 15. Not only does Plaintiff's response confirm her failure to allege what identifying information appears publicly on her profile (versus what appears in her account), but the inference she seeks is implausible even in light of her own cited material, which shows that Facebook requires only an "authentic identity" (e.g., a nickname or other identifier), not a legal name from which an *ordinary person* (*i.e.*, an objective person with no familiarity with the individual) could deduce a user's identity. Compl. at ¶ 14 n.2 (citing Facebook, Community Standards, Part IV Integrity and Authenticity, https://www.facebook.com/communitystandards/integrity_authenticity).

*Third*, unable to cite any allegation that she was logged into Facebook while watching videos on the LinkedIn Learning webpage, Plaintiff redirects to an unexplained screenshot of "event data" that supposedly establishes the transmission of user identity. But this screenshot's provenance is never explained, and on its face fails to show what Plaintiff claims. Opp. at 17. At most, the data merely indicates that Meta received some unspecified event information regarding *LinkedIn* at some point, not that she was logged into Facebook while watching videos on a LinkedIn Learning webpage. *See* Compl. at ¶ 5. Accordingly, Plaintiff's failure to allege that LinkedIn transmitted her user identity to Meta warrants dismissal of her VPPA claim.

#### 3. Plaintiff has not alleged that an ordinary person could connect her identity to her video viewing history.

Even setting aside Plaintiff's pleading deficiencies with respect to the two required components of PII, Plaintiff's opposition confirms her failure to allege that an ordinary person

could identify that a particular person watched a particular LinkedIn Learning video — *i.e.*, connect the two dots. Plaintiff does not dispute that binding precedent requires her to allege that the allegedly disclosed PII must "readily permit an ordinary person to identify a specific individual's video-watching behavior." *Eichenberger*, 876 F.3d at 985 (quoting *In re Nickelodeon*, 827 F.3d at 267). Stated differently, the standard encompasses "disclosures of information that would, with little or no extra effort, permit an ordinary recipient to identify a particular person's video-watching habits." *In re Nickelodeon*, 827 F.3d at 284. And critically, as the court recognized in *In re Hulu*, the ordinary person standard applies not merely to the individual elements of PII in isolation — the user's identity and the video title — but also to the necessary *connection* between them. *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1096 (N.D. Cal. 2015). After all, the question at the heart of the VPPA is whether an ordinary person could link a user's identity to specific video-watching behavior. *See Eichenberger*, 876 F.3d at 985.

Plaintiff neither alleges nor explains how an ordinary person could connect the two pieces of data. As explained above, *supra* sections II.C.1-2, she does not show that Meta receives *either* piece of data (identity and video viewing history) from LinkedIn, such that an ordinary person would understand them, much less *both* pieces of data. She simply repeats her conclusory allegation that anyone with a Facebook ID and, separately, a video URL can identify a specific person who watched a specific video. *See* Opp. at 19. But that is not the law. As the court explained in *In re Hulu*, like a "slip of paper with John Doe's name above a list of recently rented videotapes," the connection must be "apparent." *In re Hulu*, 86 F. Supp. 3d at 1096. The Second Circuit applied this principle in *Solomon*, holding that even when, unlike here, video titles and c_user cookies were both transmitted to Meta via the Meta Pixel, it was nonetheless implausible that an *ordinary person* could connect those two pieces of information, given that they appeared in "twenty-nine lines of code" with information "interspersed with many characters, numbers, and letters." *Solomon*, 136 F.4th at 54.

Here, Plaintiff never alleges that the data arrives at Meta in any format, readable or otherwise, that links a person to a video. She does not even allege facts demonstrating that a c_user cookie and any video URL information arrive together. While Plaintiff points to a

screenshot of a Facebook Offsite Activity Report to try to show the connection, Opp. at 19, that tool, if anything, only belies the implausibility of her claim of connection. The Offsite Activity Report screenshot doesn't identify a single video title from LinkedIn Learning. *See* Compl. at ¶ 5. In fact, it doesn't even confirm that she was watching videos at all on a LinkedIn Learning webpage. *Id.* At most, all that it shows is that some event occurred on LinkedIn. *Id.*

Moreover, nowhere does Plaintiff allege that an ordinary person could plausibly connect the two required components of PII. Indeed, her reliance on Dr. Bang's expert declaration demonstrates that she cannot. Even Dr. Bang, who is purportedly an expert, never establishes that Meta receives both information about a viewer's identity and information about that viewer's video watching history, or how the two pieces of information can be connected to one another. *See* Bang Decl. at ¶¶ 20-30. If even Plaintiff's *expert* cannot connect the dots for her, it is implausible that an ordinary person could do so. *See Eichenberger*, 876 F.3d at 985 (even where a third party "may" be able to "identify an individual" using "other information," disclosure is not actionable unless an ordinary person can connect viewer identity to viewing history).

At bottom, Plaintiff's post-hoc attempts to manufacture facts and mischaracterize her complaint cannot cure her fundamental pleading failures. That Plaintiff requires a 30-paragraph technical declaration from a purported expert — a far cry from the ordinary person contemplated in *Eichenberger* — to explain data transmissions, yet *still* cannot demonstrate that LinkedIn transmits identifiable video viewing records to any third parties (much less in any form an ordinary person would recognize as such) exposes the fundamental flaw in her case. Her complaint should be dismissed with prejudice.

**D. Plaintiff cannot meet, and barely addresses, the VPPA's scienter element.**

Here, as elsewhere, Plaintiff substitutes legal conclusions for factual allegations. Even assuming the data arrives in readable form, she offers no response to the requirement that LinkedIn must have known an ordinary person could extract and decipher both the Facebook ID and the video title from any transmitted data. *See Eichenberger*, 876 F.3d at 985. And crucially, Plaintiff ignores that *Eichenberger*'s ordinary person standard applies equally to the knowledge element: LinkedIn must have known it was transmitting PII in a format that ordinary users would

understand as revealing their identity and video choices. *In re Hulu*, 86 F. Supp. 3d at 1097. Without these facts, Plaintiff cannot satisfy the VPPA's scienter requirement.

## III. CONCLUSION

For the foregoing reasons, Plaintiff's complaint should be dismissed without leave to amend.

Dated: June 12, 2025

KEKER, VAN NEST & PETERS LLP

By: */s/ Benjamin Berkowitz*
BENJAMIN BERKOWITZ
MATAN SHACHAM
CHRISTINA LEE
NIALL M. FRIZZELL
RAISA M. CRAMER

Attorneys for Defendant
LINKEDIN CORPORATION